**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

KATHIE LIVINGSON and NATURE ) 
ADVENTURE OUTFITTERS INC. )
 )
    Plaintiff, )
 )  Civil No. 2:15-cv-00564-DCN
    vs. )
 )  **ORDER**
UNITED STATES OF AMERICA, )
UNITED STATES FISH AND WILDLIFE )
SERIVE, RAYE NILUS, *individually and* )
*in her official capacity*, SARAH DAWSEY, )
*individually and in her official capacity*, )
RYAN K. WAGNER, *individually and in his* )
*official capacity*, CHIRSTOPHER CROLLEY )
d/b/a Coastal Expeditions )
 )
    Defendants. )
_____ )

    The following matters are before the court on defendants Sarah Dawsey

("Dawsey"), Raye Nilus ("Nilus"), and Ryan K. Wagner's ("Wagner") motion to

dismiss plaintiffs' first cause of action, and plaintiffs' motion for partial summary

judgment. For the reasons set forth below, the court grants defendants' motion to

dismiss and denies plaintiffs' motion for summary judgment.

## I.  BACKGROUND[1]

    The Cape Romain National Wildlife Refuge (the "Refuge") was created by

Congress under the Migratory Bird Conservation Act in 1932. Am. Compl. ¶ 20.

Pursuant to 16 U.S.C. § 668dd et seq., the Refuge is now administered by the

Secretary of the Interior and defendant United States Fish and Wildlife Service (the

"FWS") as part of the National Wildlife Refuge System. Through various

---

[1]    The following facts were taken from plaintiffs' Amended Complaint where possible.

acquisitions since its inception, the Refuge has grown to comprise approximately sixty-six thousand (66,000) acres, covering twenty-two (22) miles along the South Carolina coast. See Pls.' Mot. Ex. A; S.C. Code Ann. § 3-3-210. One such acquisition occurred in 1991, when the United States entered into a ninety-nine (99) year lease with the South Carolina Budget and Control Board, acquiring the following property for use as a national wildlife refuge:

> [A]ll of the State of South Carolina's interest in all marsh lands, sand banks, shores, edges, lands uncovered by water at low tide, and all waterbottoms and waters which are included within the boundaries of the [Refuge], or which are contiguous and adjacent to the easterly boundary and fronting on the Atlantic Ocean at mean low tide.

Pls.' Mot. Ex. A. This grant was made subject to "existing easements for canals, ditches, flumes, pipelines, railroads, public highways and roads, telephone, telegraph, power transmission lines and public utilities." Id. Notably, the South Carolina Constitution guarantees that "[a]ll navigable waters shall forever remain public highways." S.C. Const. Art. XIV, § 4

Plaintiff Kathie Livingston ("Livingston") operates a for profit business, Nature Adventure Outfitters, Inc. ("NAO," together with Livingston, "plaintiffs"), which takes customers on nature tours, by kayak and otherwise, through various locations in the South Carolina Lowcountry. Am. Compl. ¶ 1. Certain NAO tours once passed through the waters of the Refuge, though they did not go onto Refuge land. Id. ¶ 25. In October 2013 and again in the Spring of 2014, the Refuge manager, Dawsey, informed plaintiffs that such tours required a Special Use Permit and were otherwise prohibited. Id. ¶¶ 2, 3, 22; Pls.' Mot. Exs. I, J. Dawsey's actions were confirmed by her supervisor, Nilus. Am. Compl. ¶¶ 5, 22. During the same time

period the Refuge law enforcement officer, Wagner, allegedly threatened to arrest

Livingston if she brought customers into the navigable waters of the Refuge.  Id. ¶¶ 4,

23.  Plaintiffs contend that this restriction was instituted by Dawsey to extend a

competitive advantage to her close friend, defendant Chris Crolley ("Crolley"), who

operates a competing tour company and holds an exclusive franchise to take

customers onto Refuge land.  Id. ¶ 27.

Plaintiffs filed the instant action on February 6, 2015 and amended their

complaint on March 20, 2015.  The Amended Complaint brings causes of action for:

(i) violation of due process under the Fifth Amendment of the United States

Constitution; (ii) violation of the South Carolina Unfair Trade Practices Act;  and

(iii) a writ of mandamus pursuant to 28 U.S.C. § 1361, requiring all defendants to

allow free navigation of Refuge waters.  Id. ¶¶ 17–48.  Defendants filed the instant

motion to dismiss on August 17, 2015, seeking dismissal of plaintiff's first cause of

action for violation of due process, as to defendants Dawsey, Wagner, and Nilus (the

"individual defendants").  Plaintiffs responded to the motion to dismiss on September

2, 2015 and filed their motion for summary judgment on their third cause of action for

a writ of mandamus on October 12, 2015.  Defendants responded to the summary

judgment motion on October 29, 2015, and plaintiffs replied on November 9, 2015.

This court held a hearing on both motions on December 7, 2015.  At the court's

request, both parties provided supplemental briefing in connection with defendants'

motion to dismiss on March 28, 2016.  The motions are now ripe for the court's

review.

## II.  STANDARD

### A.     Motion to Dismiss

Rule 12(c) provides, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Courts follow "a fairly restrictive standard" in ruling on Rule 12(c) motions, as "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense." 5C Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1368 (3d ed. 2011).  Ultimately, "a defendant may not prevail on a motion for judgment on the pleadings if there are pleadings that, if proved, would permit recovery for the plaintiff."  BET Plant Servs., Inc. v. W.D. Robinson Elec. Co., 941 F.Supp. 54, 55 (D.S.C. 1996).

"[A] Rule 12(c) motion for judgment on the pleadings is decided under the same standard as a motion to dismiss under Rule 12(b)(6)."  Deutsche Bank Nat'l Trust Co. v. I.R.S., 361 F. App'x 527, 529 (4th Cir. 2010); see also Burbach Broad. Co. v. Elkins Radio, 278 F.3d 401, 405 (4th Cir. 2002).  Thus, in order to survive a motion for judgment on the pleadings, the complaint must contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). In reviewing the complaint, the court accepts all well-pleaded allegations as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.  Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005).  "When there are well-pleaded factual allegations, a court should assume their

veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662 (2009).

### B.     Summary Judgment

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

# III.   DISCUSSION

## A.    Summary Judgment[2]

Plaintiffs ask the court to grant summary judgment as to their third cause of action for a writ of mandamus pursuant to 28 U.S.C. § 1361, preventing defendants from interfering with plaintiffs' right to freely navigate the navigable waters located within the Refuge.  Pls.' Mot. 2.  Defendants argue that the contours of plaintiffs' right are not as absolute as plaintiffs suggest, and that genuine issues of fact remain as to whether their regulation of plaintiffs' activity was valid.  Defs.' Response 13.

"To establish the conditions necessary for issuance of a writ of mandamus, the party seeking the writ must demonstrate that (1) he has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief he desires; and (5) the issuance of the writ will effect right and justice in the circumstances."  U.S. ex rel. Rahman v. Oncology Associates, P.C., 198 F.3d 502, 511 (4th Cir. 1999).

Plaintiffs argue that they have a clear right to relief rooted in Article XIV, Section 4 of the South Carolina Constitution, which states that "[a]ll navigable waters shall forever remain public highways free to the citizens of the State and the United States without tax, impost or toll imposed."  The Supreme Court of South Carolina has described this guarantee as "a property right of great value," which can be used for both commercial and recreational purposes.  State v. Columbia Water Power Co.,

---

[2]    In most circumstances, the court would first address the motion to dismiss, and then the motion for summary judgment.  However, in this case, plaintiffs' motion for summary judgment presents a pure question of law, which bears on the somewhat more complicated motion to dismiss. Therefore, the court will depart from the usual order and address the motion for summary judgment before the motion to dismiss.

63 S.E. 884, 888–90 (S.C. 1909); see also Brownlee v. S.C. Dep't of Health & Envtl. Control, 676 S.E.2d 116, 121 (S.C. 2009) (citing Columbia Water Power Co. and reaffirming that water is "navigable" based on its capacity for commercial or recreational use). Plaintiffs contend these rights were preserved under the 1991 lease which provides that the FWS's interest would remain subject to "existing easements for . . . public highways."[3] Pls.' Mot. Ex. A. Plaintiffs further contend that, because the FWS's only interest in the Refuge is derived from the lease, the FWS lacks the authority to interfere with the navigation of Refuge waters. Id. at 8–15. Thus, plaintiffs' argue, they possess a clear right to navigate Refuge waters and defendants have a plainly defined peremptory duty not to interfere with that right.[4] Id. at 16–19.

Plaintiffs' argument rests on the mistaken assumption that no possible state of facts exists in which the FWS could validly prohibit plaintiffs from conducting tours of the Refuge waters.[5] However, the lease is not the only source of the FWS's authority to regulate the Refuge. The Property Clause of the United States Constitution grants Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Congress tasked the FWS with the administration and management of the National Wildlife Refuge System under the

---

[3]      Defendants do not explicitly concede this interpretation of the lease, Defs.' Response 6 n.5, but offer nothing to dispute it. Plaintiffs contend that this interpretation must be correct, because the state did not even have the authority to grant an interest that would interfere with such rights. See Pls.' Mot. Ex. A-1. Because the court finds it appropriate to deny plaintiffs' motion regardless of how the lease is interpreted, it will assume plaintiff is correct for the purposes of this motion.
[4]      Plaintiffs also argue that the opportunity to apply for a permit to conduct tours does not constitute "other adequate means" to attain their desired relief. Pls.' Mot. 19–20. Because the court finds that plaintiffs do not have a clear and indisputable right to the relief sought, the court does not address this issue.
[5]      Plaintiffs do not contend that Congress lacks the power to regulate, or delegate the regulation of, Refuge waters. Rather, they contend that, due to the particular nature of the FWS's leasehold interest, Congress has not done so here. Pls.' Mot 13, 17.

National Wildlife Refuge Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. § 1688, et. seq. (the "Refuge Act").  The mission of the Refuge Act is to regulate the National Wildlife Refuge System for the purposes of "[conserving, managing, and restoring] fish, wildlife, and plant resources and their habitats . . . for the benefit of present and future generations of Americans."  16 U.S.C. § 668dd(a)(2).  Section (b)(5) of the Refuge Act authorizes the FWS to "issue regulations to carry out the Act."  16 U.S.C. § 668dd(b)(5).

Pursuant to this authority, the FWS promulgated a series of regulations found at C.F.R. § T. 50, Ch. I, Subch. C, Pt. 25, et. seq.  As a general matter, these regulations:

> apply to areas of land and water held by the United States in fee title and to property interests in such land and water in less than fee, including but not limited to easements.  For areas held in less than fee, the regulations . . . apply only to the extent that the property interest held by the United States may be affected.

50 C.F.R. § 25.11.  Under one such regulation, "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit."[6]  50 C.F.R. § 27.97.

The plain language of §§ 25.11 and 27.97 indicates that for profit tours conducted on Refuge waters fall within the scope of the FWS's regulatory authority. With respect to § 25.11, the tours in question occur on waters held in "less than fee"

---

[6]    Plaintiff makes much of the fact that nothing in the Refuge specific regulations found at 50 C.F.R. § 32.60 touches on the activity at issue in this case.  Pl.'s Mot. 5.  However, these Refuge specific regulations deal with limited hunting and fishing issues.  See 50 C.F.R. § 32.60 (setting forth regulations after stating that "the following refuge units have been opened for hunting and/or fishing"). It is clear that such Refuge specific regulations do not lessen the force of the generally applicable regulations outlined above.

and may therefore be regulated to the extent they "affect" the FWS's leasehold interest in such waters.  See 50 C.F.R. § 25.11 ("For areas held in less than fee, the regulations in this subchapter apply only to the extent that the property interest held by the United States may be affected.").  Plaintiffs have not shown, and common sense does not suggest, that their tours, which are conducted in the very location of the FWS's leasehold interest, cannot possibly affect that interest.

To the extent plaintiffs contend that their tours are not conducted "on" Refuge waters within the meaning of § 27.97 because they fall within the easement reserved under the lease, this argument is unavailing.  Pls.' Mot. 9–10; Pls.' Reply 7–8.  As an initial matter, plaintiffs appear to misunderstand the very nature of their own interest in the Refuge waters.  Simply because one holds an easement over another's property interest, it does not follow that one is not "on" another's property when exercising rights under said easement.  Easements simply allow one person to use the property of another; they do not somehow change the essential character of that property when they are exercised.  Windham v. Riddle, 672 S.E.2d 578, 582 (S.C. 2009) ("An easement is a right which one person has to use the land of another for a specific purpose, and gives no title to the land on which the servitude is imposed." (quoting Douglas v. Med. Investors, Inc., 182 S.E.2d 720, 722 (S.C. 1971))); EASEMENT, Black's Law Dictionary (10th ed. 2014) ("[A]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose.").  Because the lease granted the FWS an interest in the "waters which are included within the boundaries of the [Refuge]," plaintiffs are clearly "on" Refuge waters when they exercise their rights under the easement.  Pls.'

Mot Ex. A.  Thus, recognizing the existence of plaintiffs' easement rights does not invalidate the FWS's regulatory authority, because plaintiffs come within the scope of §§ 25.11 and 27.97 when exercising such rights.

Even assuming that plaintiffs are not considered to be "on" Refuge waters when navigating such waters within the scope of their easement, prior case law demonstrates that they are nevertheless subject to the FWS's regulatory authority.  It is undisputed that the Property Clause grants the federal government the power to "regulate conduct on non-federal land 'when reasonably necessary to protect adjacent federal property or navigable waters.'"  McGrail & Rowley, Inc. v. Babbitt, 986 F. Supp. 1386, 1394 (S.D. Fla. 1997) aff'd sub nom. McGrail & Rowley, Inc. v. U.S. Dep't of Interior, 226 F.3d 646 (11th Cir. 2000) (quoting United States v. Lindsey, 595 F.2d 5, 6 (9th Cir. 1979)) see also State of Minn. by Alexander v. Block, 660 F.2d 1240, 1249 (8th Cir. 1981) ("Under [its] authority to protect public land, Congress' power must extend to regulation of conduct on or off the public land that would threaten the designated purpose of federal lands.").

In Babbitt, the court addressed the FWS's authority under 50 C.F.R. § 27.97—the same regulation at issue here—to prohibit an operator of for-profit tours from carrying passengers to an federally owned island within the Key West National Wildlife Refuge.  See Babbitt, 986 F. Supp. 1394–95.  After discussing the federal government's power to regulate activities occurring on non-federal property, the court confirmed that the FWS could properly prohibit the tours in question.  Id.  This conclusion is supported by other cases in which courts have found that federal authorities have the power to regulate activity on non-federal property which

threatened federal interests in federal land.  See Free Enter. Canoe Renters Ass'n of

Mo. v. Watt, 711 F.2d 852, 856 (8th Cir. 1983) (upholding a prohibition on the

delivery and retrieval of rented watercraft without a permit "within the boundaries of

the Ozark National Scenic Riverways," and  finding that the phrase "within the

boundaries" properly included state and country roads within such boundaries);

Block, 660 F.2d at 1249–51 (affirming statutory prohibitions on the use of motorboats

and snowmobiles in an area containing predominately, but not exclusively, federal

land); Lindsey, 595 F.2d at 6 (upholding prohibition against camping and campfires

on riverbed outside of, but adjacent to, federal land).

Plaintiffs attempt to distinguish Babbitt on the fact that the plaintiff in that

case was actually bringing passengers onto federal property.  Pls.' Reply 5–6.

However, a close examination of the opinion reveals that this was not a necessary

predicate to the FWS's regulatory authority.  It is true that the Babbitt court

"express[ed] no opinion" on whether a state statute divested a state regulatory board

of the authority to "regulate commerce and the operation of vessels through state-

owned waters."  Babbitt, 986 F. Supp. at 1394.  Because the FWS managed the Key

West National Wildlife Refuge in accordance with an agreement and management

plan between the FWS and the state regulatory board, the Babbitt plaintiff theorized

that the FWS's regulatory authority could not exceed the Board's.  Id.  The court

clarified that, whatever the boundaries of the Board's authority may have been, they

had no bearing on the FWS's independent authority to regulate federal lands.  Id.

In analyzing the FWS's authority to regulate federal lands, the court noted that

"[t]he agency plainly has the power to regulate conduct 'on or off the public land that

would threaten the designated purpose of federal lands.'" Id. at 1395 (quoting Block, 660 F.2d at 1249)). The court went on to find that "there [was] sufficient evidence in the record . . . to corroborate the [FWS's] determination that regulation of the waters surrounding the refuge islands is necessary to preserve their wilderness character." Id. at 1395 n.5. This language would be both unnecessary and confusing if the court intended to hold that the FWS's regulatory authority was entirely dependent on the fact that the tours carried passengers onto the islands. Id. Thus, the court's ruling was ultimately premised on a finding that the regulated activity had the potential to impact the federal property. Of course, the fact that the passengers were being taken directly onto federal land supported such a finding, but it by no means follows that it was a necessary component of the Babbitt court's holding.

Plaintiffs also argue that the authority to restrict navigation of Refuge waters lies solely with the Secretary of the Army under 33 U.S.C. § 1, because it was never specifically delegated to the FWS. Pls.' Mot. 11–12. Plaintiffs' only support for this proposition is 33 U.S.C. § 1, which provides that:

> It shall be the duty of the Secretary of the Army to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States . . . covering all matters not specifically delegated by law to some other executive department.

33 U.S.C. § 1 (emphasis added). Plaintiff's interpretation of 33 U.S.C. § 1 finds no support in the relevant case law. As discussed above, the Babbitt court determined that the FWS had the authority to regulate navigable waters without any discussion of whether that power was "specifically delegated." See Babbitt, 986 F. Supp. at 1394–95. Moreover, the Refuge Act specifically states that it was enacted for the purpose of consolidating the authorities relating to "all lands, waters, and interests" within the

Refuge System.  16 U.S.C.A. § 668dd.  It would be absurd to find that this delegation of authority did not include navigable waters, simply because it did not explicitly use the word "navigable."

Because defendants' regulatory authority extends to activities that affect federal property, it is at least possible that defendants' regulation of plaintiffs' tours was valid, even if one accepts plaintiffs' argument that their tours were not conducted "on" federal property.  See Babbitt, 986 F. Supp. at 1394–95; 50 C.F.R. § 25.11.  Plaintiffs note that this means it is possible for the FWS to regulate a whole host of activities occurring outside the Refuge[7] and argue that the law cannot have placed "such arbitrary and abusive power into the hands of" the FWS.  Pls.' Reply 6.  Plaintiffs are correct in concluding that the law has not granted the FWS with "arbitrary and abusive power," but this is not because the FWS's regulatory power is strictly constrained by the physical boundaries of federal property.  Rather, the FWS is constrained by the requirement that the regulation of non-federal property must be "reasonably necessary" to protect the Refuge.  See Babbitt, 986 F. Supp. at 1394 ("[T]he federal government has authority to regulate conduct on non-federal land 'when reasonably necessary to protect adjacent federal property or navigable waters.'" (quoting Lindsey, 595 F.2d at 6)).  Though this limitation may elude precise definition, this flexibility is entirely appropriate to address the various and complex environmental threats facing the species and habitats within the Refuge System.  At

---

[7]     Plaintiffs also contend that defendants' argument is inconsistent:  on one hand, defendants recognize that they lack the power to regulate commercial fishing or shell fishing, but on the other, they contend that they can regulate plaintiffs' navigation of the Refuge waters, though both are protected under the lease.  Pls.' Reply 3.  However, the power to regulate commercial fishing was reserved through a separate clause which spoke directly in terms of regulatory authority, not property interests.  See Pls.' Mot. Ex A.  Because plaintiffs claim defendants' regulatory authority was constrained by solely their property rights, the court finds the above analysis applicable regardless of how that analysis might change if applied to the regulation of commercial fishing or shell fishing.

this juncture, limited discovery has occurred and the court is in no position to assess the substantive merits of defendants' decision to impose the regulation at issue.

Therefore, the court denies plaintiffs' motion for summary judgment.

**B.     Motion to Dismiss**

In their motion to dismiss, the individual defendants ask the court to dismiss plaintiffs' first cause of action against them for violation of plaintiffs' Fifth Amendment Constitutional right to due process.[8]  Defs.' Mot. 2.  The individual defendants argue that they are entitled to protection under the defense of qualified immunity.[9]  Plaintiffs claim that the individual defendants are not entitled to qualified immunity because they clearly acted outside of the scope of their regulatory authority and because their actions were motivated by an impermissible desire to harm plaintiffs' business.  Pls.' Resp. 9–13.

In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court provided for "a direct cause of action under the Constitution of the United States against federal officials for the violation of federal constitutional rights."  Pronin v. Duffey, No. 5:13-cv-3423, 2014 WL 2881149, at *3 (D.S.C. June 24, 2014).  A Bivens claim is analogous to a claim under 42 U.S.C.

---

[8]     The individual defendants expressed some initial confusion over whether plaintiffs claim is based on their procedural or substantive due process rights.  Defs.' Mot. 3 n.3.  While defendants' confusion was not wholly unjustified, plaintiffs' pleadings and briefs are best understood as alleging a breach of their substantive due process rights.  See Am. Compl. ¶ 24 (directly addressing plaintiffs' "rights to freely navigate public navigable waters"); Pls.' Response 7 (same); see also Am. Compl. ¶ 31 (alleging that "[d]efendants' action have stripped from Plaintiffs a substantial and substantive legal right . . . without legal process or due process of law").  Neither parties' pleadings, briefs, or oral arguments discussed any issue of procedural process with any detail.  Thus, it has become sufficiently clear that plaintiffs are proceeding on a theory of substantive due process.

[9]     The individual defendants also argue they must be dismissed from the suit entirely to the extent plaintiffs bring claims against them in their official capacity.  Defs.' Mot. 2.  At the hearing, plaintiffs' counsel conceded that there are no claims being brought against the motion defendants in their official capacities.  Therefore, the court grants this component of the individual defendants' motion.

§ 1983, which applies to constitutional violations by persons acting under the color of state law.[10] Id.

Under the qualified immunity defense, federal officials are immune from suit under a Bivens claim, unless the court determines that: "(1) [] the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) [] that right was clearly established at the time of the alleged misconduct." Odom v. U.S., No. 5:13-cv-01231, 2014 WL 1234176, at *10 (D.S.C. Mar. 25, 2014) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). "In determining whether the right violated was clearly established, the court defines the right 'in light of the specific context of the case, not as a broad general proposition.'" Id. (quoting Parrish v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004). "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." Id. (quoting Parrish, 372 F.3d at 301). Though the court must consider the specific context of the case, this does not mean it is necessary to show that courts have previously found the activities in question to be unlawful. See Anderson v. Creighton, 483 U.S. 635, 640 (1987) (stating that it is not necessary to show that "the very action in question has previously been held unlawful"). Rather, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held

---

[10]     Case law involving § 1983 claims is applicable in Bivens actions and vice versa. Pronin, 2014 WL 2881149, at *3 (citing Farmer v. Brennan, 511 U.S. 825, 833–42 (1994)).

unlawful.'"  United States v. Lanier, 520 U.S. 259, 271 (1997) (quoting Anderson,

483 U.S. at 640).

At the outset, the court notes that plaintiffs have effectively advanced two

distinct theories to support their Bivens claim.  Under the first theory, they allege that

the individual defendants are liable for simply prohibiting them from navigating the

Refuge waters without a permit.  Pls.' Resp. 7.  Plaintiffs contend that the individual

defendants deprived them of their right to navigate the Refuge waters, and because

the FWS had no authority to do so, this deprivation was unlawful.  Pls.' Supp. Br. 4–

5.

Under the second theory, plaintiffs highlight their allegations that the

individual defendants restricted their navigation of the Refuge waters with the

specific intent to harm their business and benefit Dawsey's close personal friend.[11]

Pls.' Response 12.  This changes the character of the claim substantially.  Because an

otherwise valid administrative action "may be invalidated [by] an impermissible

secondary motive," Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist., 2012

WL 1131387, at *19 (E.D. Cal. Mar. 29, 2012), this motive-based theory does not

turn on the FWS's regulatory authority.  Regardless of whether the FWS could

regulate navigation of the Refuge waters in certain circumstances, FWS officials are

not empowered to exercise their regulatory authority in an "arbitrary or conscience

shocking" manner.  Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (quoting

---

[11]     When taken in the light most favorable to plaintiffs, the pleadings indicate that Dawsey
imposed the permit requirement "in order to extend a competitive advantage to her close friend,
[Crolley] by barring all other nature tour operators."  Am. Compl. ¶ 27.  Though the amended
complaint does not directly contend that Wagner and Nilus shared this intent, it does indicate that they
were "aware" of the competition between Crolley and plaintiffs, and that Crolley was granted an
exclusive franchise to conduct tours on Refuge land through their "instigation and support."  Id. ¶¶ 27,
28.

Collins v. City of Harker Heights, Tex., 503 U.S. 115, 126 (1992)).  Because the court wishes to highlight at least one ground for its decision that is not uniformly applicable to both theories, the court will address each theory in turn.

### i.    "Exceeded Regulatory Authority" Theory

Plaintiffs' initial theory is easily disposed of under the qualified immunity analysis.  As discussed above in section III.A., the court finds that plaintiffs' right to navigate the Refuge waters pursuant to the South Carolina Constitution does not preclude FWS regulation of such waters.  Assuming the individual defendants did not act with an improper motive, the foregoing discussion suggests that their actions did not violate plaintiffs' rights at all.  Even if the individual defendants did exceed their regulatory authority, the preceding section outlines the many reasons why a "reasonable officer" might have believed that enforcing the special permit requirement was not unlawful.  Therefore, the court finds that even if the FWS's regulation deprived the plaintiffs of certain property rights afforded by the South Carolina Constitution, defendants would be entitled to qualified immunity because those rights were not "clearly established at the time of the alleged misconduct."  See Pearson, 555 U.S. at 232.

### ii.    "Improper Motive" Theory

As for plaintiffs' motive-based theory, there is certainly reason to think that the individual defendants would not be entitled to qualified immunity from such a claim on the basis of the pleadings.  See Hardesty, 2012 WL 1131387, at *19 (noting that an otherwise valid administrative action "may be invalidated [by] an impermissible secondary motive" and denying defendants qualified immunity

argument in light of case law clearly establishing such a rule).  Given that the "core of the [due process] concept" is the protection against arbitrary action, <u>Lewis</u>, 523 U.S. at 845, the court seriously doubts whether a "reasonable officer" could honestly believe they were permitted to enforce regulations specifically in an effort to advance the interests of a personal friend by harming a competitor's business.[12]

Nevertheless, the court chooses not to address the qualified immunity question under this theory, because it finds that the underlying <u>Bivens</u> action is not even available.[13]  As stated above, the <u>Bivens</u> Court provided for "a direct cause of action under the Constitution of the United States against federal officials for the violation of federal constitutional rights." <u>Pronin</u>, 2014 WL 2881149, at *3.  However, the Court has made clear that a <u>Bivens</u> remedy is "not an automatic entitlement" in every instance of a constitutional violation.  <u>Wilkie v. Robbins</u>, 551 U.S. 537, 550 (2007). In fact, a <u>Bivens</u> remedy is not guaranteed even if the underlying constitutional right at issue has provided the basis for a <u>Bivens</u> claim in another context.  <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 78 (2001) ("[A] <u>Bivens</u> action alleging a violation of

---

[12]        To this point, the court notes that while <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 819 (1982) "defined the limits of qualified immunity essentially in objective terms," this "reasonable person" standard can still consider an official's subjective mental state when that mental state is an essential part of the plaintiff's cause of action.  In such cases, the "clearly established" inquiry simply asks whether a reasonable person would have known that the defendant's actions, when conducted with the relevant mental state, would violate the plaintiff's rights.  This concept was explicitly recognized in <u>Crawford-El v. Britton</u>, which explained that "improper motive . . . may be an essential part of a plaintiff's affirmative case" and that the objective standard established in <u>Harlow</u> was limited to the scope of the qualified immunity defense.  523 U.S. 574, 589 (1998).  Therefore, while it is certainly possible that a reasonable person might be unaware that certain conduct, undertaken with the requisite intent, would violate a plaintiff's constitutional rights, that does not remove the defendant's intent from the analysis.  On the contrary, it remains a crucial part of the analysis, as the court must then determine whether a reasonable person would recognize the constitutional significance of such intent.

[13]        Because the court finds that plaintiffs' initial theory is easily disposed of under the qualified immunity analysis, the following discussion focuses on the availability of a <u>Bivens</u> action under the second, motive-based theory.  However, the court does not mean to suggest that a <u>Bivens</u> action is available under the initial theory; it simply wishes to emphasize that, regardless of the availability of <u>Bivens</u> claim under the initial theory, it would be barred by qualified immunity.  To the extent the following discussion applies to both theories, the court finds they are equally unavailable as <u>Bivens</u> actions.

the Due Process Clause of the Fifth Amendment may be appropriate in some contexts, but not in others." (quoting <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 484 n.9 (1994))).  Ultimately, "any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee," and "in most instances [the Court] [has] found a <u>Bivens</u> remedy unjustified."  <u>Wilkie</u>, 551 U.S. at 550.

The Supreme Court outlined the framework for making such a judgment in <u>Wilkie v. Robbins</u>:  first, the court must determine "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages," and in the absence of such an alternative, "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed[] [] to any special factors counselling hesitation before authorizing a new kind of federal litigation."  <u>Id.</u>

As to the first factor, Congress may provide for "meaningful safeguards or remedies" that preclude the court from recognizing a <u>Bivens</u> remedy, even if those protections do not provide "complete relief."  <u>Schweiker v. Chilicky</u>, 487 U.S. 412, 425 (1988) (finding that "Congress . . . [did] not fail[] to provide meaningful safeguards or remedies" despite the fact that "Congress [] failed to provide for 'complete relief'"); <u>see also</u> <u>Ameur v. Gates</u>, 759 F.3d 317, 327 (4th Cir. 2014) <u>cert. denied</u>, 135 S. Ct. 1155, 190 L. Ed. 2d 916 (2015) ("We may not assume that a constitutionally mandated remedy exists for [appellant] merely because he cannot locate a remedy elsewhere.").

In this case, 50 C.F.R. § 25.45 provides that "[a]ny person who is adversely affected by a refuge manager's decision or order relating to the person's permit . . . , or application for permit" may seek reconsideration from the refuge manager, and if such reconsideration is unsuccessful, may appeal to the area manager, and ultimately, the regional director.  The regional director's decision constitutes a final agency decision subject to judicial review under the Administrative Procedure Act ("APA"). 5 U.S.C. § 702.  A number of courts have found <u>Bivens</u> to be unavailable where plaintiffs had recourse to an alternative remedial scheme of this nature.  <u>See, e.g.</u>, <u>Chilicky</u>, 487 U.S. at 424 (declining to recognize <u>Bivens</u> where Social Security claimants had access to reconsideration by state agency, followed by review by federal ALJ, followed by Appeals Council administrative review, ultimately followed by judicial review); <u>Miller v. U.S. Dep't of Agr. Farm Servs. Agency</u>, 143 F.3d 1413, 1416 (11th Cir. 1998) (declining to recognize <u>Bivens</u> action where plaintiff had access several levels of state agency and administrative review as well as federal judicial review through the APA).  Some courts have gone so far as to find that the availability of APA review alone is sufficient to preclude the availability of <u>Bivens</u>. <u>W. Radio Servs. Co. v. U.S. Forest Serv.</u>, 578 F.3d 1116, 1123 (9th Cir. 2009) (concluding "that the APA leaves no room for <u>Bivens</u> claims based on agency action or inaction"); <u>Miller</u>, 143 F.3d at 1416 ("Under our circuit's precedents, the existence of a right to judicial review under the APA is, alone, sufficient to preclude a federal employee from bringing a <u>Bivens</u> action.").  While the court finds it unnecessary to adopt such an absolute rule at this time, the cases cited above strongly suggest that plaintiffs have an adequate means of protecting their rights without a <u>Bivens</u> remedy.

Wilkie itself is instructive on this point.  In Wilkie, a ranch owner brought Bivens claims against various Bureau of Land Management ("BLM") employees for engaging in a campaign of harassment against him, as retaliation for the plaintiff's refusal to grant the BLM an easement.  Wilkie, 551 U.S. at 543–47.  The Court separated the various harms inflicted by the BLM employees into four categories: tort-like injuries, claims and charges brought against him, unfavorable agency actions, and events eluding classification.  Id. at 551–53.  Though the Court ultimately went to the second step in its analysis, it did so only because the variety of injuries suffered by the plaintiff created a "patchwork" of forums for defense and redress.  Id. at 554.  As it relates to this case, the Wilkie Court explicitly recognized that "when the incidents are examined one by one, [the plaitniff's] situation does not call for creating a constitutional cause of action for want of other means of vindication."  Id. at 555.

Here, the court is effectively faced with an isolated use of one of the harms directed at the plaintiff in Wilkie.  Plaintiffs could apply for a special permit to conduct their tours through the Refuge, and if rejected, they would be faced with an unfavorable agency action.  In this case, plaintiffs could seek administrative review, and ultimately, judicial review under the APA.  50 C.F.R. § 25.45; 5 U.S.C. § 702.  This basic procedure was found sufficient in Wilkie.  551 U.S. at 552 (noting that for each unfavorable agency action "administrative review was available, subject to ultimate judicial review under the APA") see also W. Radio Servs. Co. v. U.S. Forest Serv., 578 F.3d 1116, 1122 (9th Cir. 2009) (noting "that Wilkie itself gave us a strong indication that the APA constitutes an 'alternative, existing process' for [] damages

21

claims based on agency actions and inactions").  Alternatively, plaintiffs might simply conduct their tours in violation of the FWS's permit requirement, subjecting themselves to administrative or criminal charges.  Wilkie indicates that even this situation would not call for the recognition of a Bivens action, because plaintiffs would still have the ability to contest their charges.[14]  Wilkie, 551 U.S. at 552 ("For each charge, . . . [plaintiff] had some procedure to defend and make good on his position. He took advantage of some opportunities, and let others pass; although he had mixed success, he had the means to be heard.").  In either case, plaintiffs have some means of challenging the FWS's enforcement of the permit requirement.  Certainly, they may not have all of the same remedial tools available under Bivens, but again, this is not required.  Chilicky, 487 U.S. at 425.  All that is required is an "alternative, existing process" that provides a "convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Wilkie, 551 U.S. at 550.  The Supreme Court's decision in Wilkie and the other cases cited above suggest that such a process is already available.

Plaintiffs argue that the court should look to Dunbar Corp. v. Lindsey, in which the Fourth Circuit recognized a landowner-plaintiff's Bivens claim against certain military personnel who were involved in forcibly taking the plaintiff's land. 905 F.2d 754, 756 (4th Cir. 1990).  However, Dunbar is readily distinguishable from the instant case, on both the law and the facts.  As an initial matter, Dunbar was decided a full seventeen years before the Supreme Court's decision in Wilkie.  While the Dunbar court recognized that "a Bivens action is appropriate only where there are

_____

[14]     This is to say nothing of the fact that under such a hypothetical, the plaintiffs would have already foregone one avenue of relief.

'[1] no special factors counselling hesitation in the absence of affirmative action by Congress, [2] no explicit statutory prohibition against the relief sought, and [3] no exclusive statutory alternative remedy,'" id. at 761 (quoting Chilicky, 487 U.S. at 421), the court went on to state that "the Court has not fully fleshed out these considerations, making our task more difficult."  Id.  Not only have subsequent cases given shape to these considerations, but Wilkie announced a substantially different formulation of the Bivens test that the one used in Dunbar.  While Dunbar stated that courts may recognize Bivens actions where there was no "explicit statutory prohibition" or "exclusive statutory alternative remedy," id. at 761, these preclusive parameters were phrased much more broadly in Wilkie, which made Bivens unavailable where there was a "alternative, existing process" that provided a "convincing reason" not to recognize "a new freestanding remedy in damages." Wilkie, 551 U.S. at 550.  The Wilkie formulation is clearly more restrictive, suggesting that Dunbar's analysis may no longer be appropriate.

Moreover, in finding that "Congress [had] not provided an adequate alternative remedy," the Dunbar court noted the deficiencies of the Federal Tort Claims Act ("FTCA").  Dunbar, 905 F.2d at 762.  However, the protections offered by FTCA are not comparable to those available in this case under the APA.  Unlike the APA, the FTCA possesses a "unique deficiency" because it "[authorizes] [] only those actions allowed by the law of the place where the act or omission occurred," and therefore, does not provide uniform protection throughout the country.  Western Radio Servs., 578 F.3d at 1124; see also Carlson v. Green, 446 U.S. 14, 23 (1980) ("[A]n action under FTCA exists only if the State in which the alleged misconduct

occurred would permit a cause of action for that misconduct to go forward . . . . Yet it is obvious that the liability of federal officials for violations of citizens' constitutional rights should be governed by uniform rules.").  The APA, on the other hand, applies uniformly throughout the country.[15]  W. Radio Servs., 578 F.3d at 1124.

Most importantly, the Dunbar court distinguished itself from the Supreme Court's decision in Chilicky by noting that in Chilicky there was a system for protecting the plaintiffs' rights which enabled them "to seek two levels of administrative review and then judicial review, including review of constitutional claims."  Dunbar, 905 F.2d at 763.  "In stark contrast," the court found:

> no comprehensive system exists to protect Dunbar's possessory interest in the land.  Indeed, only state law provides some basis for the vindication of Dunbar's rights.  In no way does this provide an adequate (and certainly not an equally effective) means set up by Congress for the protection of constitutional rights.

Id.  The instant case is much more like Chilicky than Dunbar under this comparison. Plaintiffs certainly have means other than state law to protect their rights, which include both administrative and judicial review.  Because Dunbar is distinguishable in both its application of the law and the facts, it does not disturb the court's conclusion that no Bivens remedy is available in this case.

---

[15]      The Western Radio Services court also noted that while both the FTCA and APA pre-date the Supreme Court's decision in Bivens and were both subject to post-Bivens amendments, the congressional comments accompanying the post-Bivens amendments to the FTCA "made it crystal clear that Congress views FTCA and Bivens as parallel, complementary causes of action," while there are no similar indications of congressional intent with respect to the APA.  W. Radio Servs, 578 F.3d at 1124 (quoting Carlson v. Green, 446 U.S. at 19–20)

## IV   CONCLUSION

For the foregoing reasons, the court **GRANTS** the individual defendants'

motion to dismiss and **DENIES** plaintiffs' motion for summary judgment.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 31, 2016**
**Charleston, South Carolina**